IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED  STATES  OF  AMERICA** | : | **Crim. No. 1:12-CR-0243-02** |
| | : | |
| **v.** | : | |
| | : | |
| **ELIJAH U. BROWN, JR.** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

In this criminal case, Defendant was charged with two counts related to his alleged possession of a firearm in the Middle District of Pennsylvania.  (Doc. 1.)[1] Presently before the court is Defendant's motion to suppress, wherein he seeks suppression of the physical evidence seized from his residence at 1622 Park Street and his statements made thereafter due to an alleged unconstitutional entry and search of the residence at issue.  (Doc. 162.)  Because the court finds that Defendant was not subject to custodial interrogation when he identified the presence and location of the firearm at question, that he consented to the entry into the residence, and that he was provided with his Miranda warnings before he made his voluntary statement, the court will deny Defendant's motion to suppress in its entirety.

## I.        **Background**

On September 26, 2012, Elijah U. Brown ("Defendant") and Carlos C. Hill ("Hill") were each charged with two counts related to an incident involving their alleged possession of an unlawful handgun.  (*See* Doc. 1.)  Although the indictment

---

[1]  The two counts contained in the September 26, 2012 indictment are as follows: (1) Count 1- possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(e); and (2) Count 2- possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2).  (Doc. 1.)

jointly charged both Defendant and Hill, the court granted Hill's motion to sever

Defendants for trial, to which neither Defendant nor the Government opposed.  (*See*

Doc. 58.)  Following several motions to continue trial, including continuances

occasioned by the court's appointing substitute counsel on behalf of Defendant (*see*

Doc. 119), jury selection was ultimately scheduled to commence on May 5, 2014

(Doc. 154).

On April 10, 2014, Defendant filed the instant motion to suppress

evidence (Doc. 162) and brief in support (Doc. 163), and the court scheduled a

hearing on the matter to be held April 25, 2014 (Doc. 165).  Defendant's motion is

premised on his position that the firearm for which he was indicted was the subject

of an unconstitutional entry into his home.  Defendant reasons that the firearm

charged in the indictment, *to wit*, a Ruger, model P95DC, 9mm pistol, serial number

311-07785, should be suppressed as the product of an unreasonable search and

seizure, and that any statement he made following the seizure must be suppressed as

"fruit of the poisonous tree."  (*See* Doc. 163.)  It is uncontested that law enforcement

officers seized the firearm from Defendant's bedroom without the benefit of the

warrant.  However, because the credible evidence presented at the hearing satisfies

the court that Defendant gave consent for the seizure, the court concludes that the

warrantless search and seizure was not unconstitutional.

At the suppression hearing, the Government presented the testimony of

two witnesses.  Harrisburg Bureau of Police Detective Christopher Krokos, the lead

detective in this case, testified that, on July 13, 2012, he was engaged in an

investigation regarding the robbery of a motor vehicle.  Based on information

relayed to him by responding officers, he arrived at a residence at 1624 Park Street,

Harrisburg, Pennsylvania, to speak with Robert Hearn, the registered owner of the green SUV that was implicated in the underlying robbery.  Based on his conversation with Hearn, Detective Krokos learned that the vehicle was in Defendant's possession at the time of the incident.  Thereafter, Detective Krokos noticed an individual on the porch outside of the residence located next door at 1622 Park Street.  The detective engaged the individual, the identity of whom was unknown to Detective Krokos at the time, in casual conversation.  The individual, later identified as Defendant, relayed that he lived at the residence, but that it was his mother's house.  While Detective Krokos was speaking with Defendant, who was not being detained at the time, Defendant's mother, Dorothy Brown ("Ms. Brown"), came out of her house. Based on his knowledge of facts at the time, Detective Krokos believed that evidence of the robbery may be found inside the residence, and indicated his intention to obtain a search warrant.  Detective Krokos did not go inside the residence, but instructed Ms. Brown that the house had to be vacated by the other occupants. Detective Krokos explained to, *inter alia*, Defendant and Ms. Brown that they were not detained, but that they could not go back inside the residence.

After other officers arrived, including now-Chief of Police[2] Thomas Carter and a uniformed police officer positioned at the front door to ensure the integrity of the scene, Detective Krokos left the scene for purposes of interviewing other witnesses and to apply for a search warrant.  At the time of Detective Krokos's departure, no one was being detained.  Chief Carter, who knew Defendant before the relevant date, stayed at the scene across the street from the front door of the

---

[2] On the date at issue, Thomas Carter was a Sergeant with the Harrisburg Bureau of Police. For purposes of clarity, especially because there is another officer involved in the investigation named Timothy Carter, Thomas Carter will be referred to as Chief Carter.

residence at 1622 Park Street.  During this time, Defendant engaged Chief Carter in conversation.  Notably, Defendant's movement remained unrestricted, his actions constrained only by the officer's limitation that no one could go inside the house.

To presumably speak with more privacy, Chief Carter invited Defendant to join him just inside the front door of the house and, after Chief Carter explained the subject of the officer's investigation, Defendant informed Chief Carter that there was a firearm between a mattress in his bedroom on the third floor of the house. After explaining that the gun belonged to another person with whom he shared the bedroom, Defendant told Chief Carter that there was no need to obtain a search warrant and that he could go retrieve the weapon.  Chief Carter called Detective Krokos to inform him that he need not apply for a search warrant because Defendant verbally consented to the search of his bedroom for purposes of retrieving the firearm.  Based on that information, Detective Krokos ultimately did not apply for a search warrant, and Chief Carter, assisted by other officers, found the subject firearm at the exact location Defendant identified.

Defendant was thereafter given his Miranda warnings before being questioned by Detective Krokos at the police station.  Detective Krokos testified that he explained Defendant's constitutional rights during the initial portion of the interview.  Upon review of Defendant's verbal statement, a transcript of which was admitted into evidence at trial, and upon consideration of the detective's testimony, it is clear that Defendant was given his Miranda warnings before the verbal statement commenced but that he had voluntarily agreed to speak with Detective Krokos at the police station.

In addition to his own testimony, Defendant presented the testimony of his mother.  Ms. Brown testified that she did not give consent to search the residence, despite being asked to consent by the officers.  While Ms. Brown took exception with the officers' restriction that she could not reenter her house until the search warrant was obtained, she corroborated the testimony of Detective Krokos and Chief Carter to the extent that she testified that the officers informed the former occupants of the house that they were free to leave but could not reenter the residence.  Ms. Brown further corroborated Chief Carter's testimony inasmuch as she testified that Defendant engaged Chief Carter in the conversation that lead to Chief Carter learning of the firearm and location thereof.

Portions of Defendant's testimony also corroborated the testimony of Detective Krokos and Chief Carter.  For example, Defendant testified that he engaged Chief Carter in conversation, but thereafter explained that he felt as though he was not free to leave.  Defendant also testified that Detective Krokos said that Defendant could not leave the scene, but would not explain the reason for his detention.  Defendant further testified that the first time he was placed in handcuffs was when he was taken to the police station.  To the extent Defendant's testimony conflicted with that of other witnesses, the court found the testimony of Defendant less credible than that of Detective Krokos or Chief Carter.

## II.        Legal Standard

On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).  The

applicable burden is proof by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

The Fourth Amendment to the Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  The touchstone of the Fourth Amendment is reasonableness, as the Fourth Amendment does not prohibit all searches – only those that are unreasonable. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal citations omitted).  The general rule is that the warrantless entry into a person's house is unreasonable per se.  *Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (citation omitted)).

One exception to the warrant requirement, however, is a search or seizure conducted pursuant to voluntary consent.  *See United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  To justify a search based on consent, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  To determine whether consent was given voluntarily, a court examines the totality of the circumstances.  *Price*, 558 F.3d at 278.  Factors important to this analysis include the age, education, and intelligence of

the consenter, whether he was advised of his constitutional rights, the length of the encounter, the duration of the questioning, and the use of physical punishment. *Id*. Also relevant is the setting in which the consent was obtained and the parties' actions. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). Fundamental to the concept of voluntariness is that valid consent must not be coerced. *Schneckloth*, 412 U.S. at 228.

## III.        Discussion

Initially, the court must determine whether the encounter between Chief Carter and Defendant leading to Defendant's consent to search was consensual, as it is undisputed Defendant did not receive his Miranda rights until after the firearm was retrieved. Considering all the surrounding circumstances, the court easily concludes that Defendant was not seized at the time he engaged Chief Carter in conversation.

Not every interaction between a police officer and a citizen is protected by the Fourth Amendment. Indeed, an encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. . . . 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a "seizure" has occurred.'" *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *Id.* (citing *United States v. Drayton*, 536 U.S. 194, 200 (2002)).

In *United States v. Mendenhall*, 446 U.S. 544, 551 (1980), the Supreme Court provided guidance on whether an encounter between an individual and a law enforcement officer is consensual.  The Court listed several factors indicative of a seizure, including: "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled."  446 U.S. at 554.

The record does not support the conclusion that the encounter between Defendant and Chief Carter was anything other than consensual and initiated by Defendant.  Although Defendant argues that he felt as though he was detained, the court credits the testimony of Detective Krokos, Chief Carter, and Ms. Brown, inasmuch as they all testified that everyone, including Defendant, was instructed that he or she was free to go anywhere except inside the residence.[3]  Moreover, the court notes that Defendant initiated the conversation with Chief Carter, that he was not physically restrained, and that there is no indicia that Chief Carter intimidated or otherwise coerced Defendant's statement.  Moreover, applying the foregoing considerations to the case at bar, the court concludes that Defendant voluntarily consented to Chief Carter's search of the bedroom for the firearm.  The court is persuaded that the reason Defendant initiated the conversation with Chief Carter and gave consent for Chief Carter to retrieve the weapon was to protest ownership of the

---

[3]  The court notes that there was testimony that Defendant did not reside at the 1622 Park Street address, but rather only occasionally stayed there.  The court finds that Defendant did live at 1622 Park Street for purposes of the Fourth Amendment inquiry, but notes that, had the credible evidence established that Defendant was not a resident of that address, a standing issue may be present as Defendant cannot assert the Fourth Amendment rights of another, in this case, Ms. Brown.  However, for purposes of the instant motion, the court concludes that Defendant had a privacy interest in the residence and could properly give consent to search.

firearm.  Indeed, Chief Carter testified that, after Defendant informed him of the weapon's location, Defendant immediately protested ownership, alleging that it belonged to someone else.  Based on the evidence presented at the hearing, the court finds that Defendant initiated a consensual encounter with Chief Carter, that Defendant voluntarily informed Chief Carter of the presence and location of the firearm, and that Defendant voluntarily consented to the search of his bedroom. Accordingly, the court concludes that the consent exception to the warrant requirement is applicable, and the evidence obtained following the search of Defendant's bedroom is admissible.

Regarding Defendant's argument that he was not given his Miranda rights and that his statements to Detective Krokos must be suppressed, the court finds that the credible evidence presented at the hearing establishes that Defendant received his Miranda rights before he was subject to custodial interrogation.  The court concludes that the Government has proved by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his Miranda rights when he spoke to Detective Krokos at the station.  The court does not find credible Defendant's testimony that Defendant Krokos only provided a cursory overview of his rights.  The transcript of the voluntary statement clearly includes an affirmation that Detective Krokos "Mirandized [Defendant] before [they] talked," (Gov. Ex. 1, admitted at Hearing, April 24, 2014), thereby corroborating the testimony of Detective Krokos.  Thus, the court concludes that Defendant's decision to answer Detective Krokos's questions represented a knowing, voluntary, and intelligent waiver of his Fifth Amendment rights, and that Defendant's answers to those questions are, therefore, admissible.  *See United States v. Velasquez*, 626 F.2d 314,

320 (3d Cir. 1980) (providing that a defendant who answers questions after being advised of his rights may be deemed to have waived his rights).

**IV.**         <u>**Conclusion**</u>

For the foregoing reasons, the court concludes that the Government has proved, by a preponderance of the evidence, that the search of Defendant's bedroom and subsequent seizure of physical evidence was constitutionally sound and not in violation of Defendant's constitutional rights and that any statement Defendant gave thereafter was made voluntarily, knowingly, and intelligently. Accordingly, the court will deny Defendant's motion to suppress in its entirety.

An appropriate order will issue.

<u>     s/Sylvia H. Rambo     </u>
United States District Judge

Dated:  April 28, 2014.